Argued and submitted September 1, 2005, affirmed June 14, 2006

QUAIL HOLLOW WEST
OWNERS ASSOCIATION,
an Oregon non-profit corporation,
*Appellant,*

*v.*

BROWNSTONE QUAIL HOLLOW, LLC,
an Oregon limited liability company;
Brownstone Quail Hollow,
an Oregon assumed business name;
Brownstone Homes, LLC,
an Oregon limited liability company;
Brownstone Homes,
an Oregon assumed business name;
Randall C. Myers and Ralph W. Fullerton, III,
*Respondents.*

BROWNSTONE QUAIL HOLLOW, LLC,
an Oregon limited liability company;
Brownstone Quail Hollow,
an Oregon assumed business name;
Brownstone Homes, LLC,
an Oregon limited liability company
and Brownstone Homes,
an Oregon assumed business name,
*Third-Party Plaintiffs,*

*v.*

TRC EXCAVATING, INC.,
an Oregon corporation;
Terra-Sol Landscaping, LTD,
an Oregon limited liability partnership;
LDN Construction, Inc.,
an Oregon corporation;
A&T Siding, Inc.,
an Oregon corporation;
Josh Rauch,
an individual,
dba JTR Construction;

Dougherty Construction, Inc.,
an Oregon corporation;
Mark Larsen,
dba Mark Larsen Finish Carpentry;
Kerry Becker Concrete Company,
an Oregon corporation;
Bruce Morin Custom Gutters, LLC,
an Oregon limited liability company;
Four Seasons Heating & A/C Service, Inc.,
an Oregon corporation;
R. Klindtworth Roofing, Inc.,
an Oregon corporation;
Dowers Waterproofing, Inc.,
an Oregon corporation;
Portland Paint Pros., Inc.,
an Oregon corporation;
Tahoma Painting, Inc.,
an Oregon corporation
and Simon Cam,
an individual,
dba Simon Cam Painting,
*Third-Party Defendants.*

C034386CV; A125874

136 P3d 1139

A. Richard Vial argued the cause for appellant. On the briefs were Christopher M. Tingey and Vial Fotheringham LLP.

Bruce R. Gilbert argued the cause for respondents. With him on the brief were Jennifer A. Krumm and Smith Freed & Eberhard, PC.

Before Landau, Presiding Judge, and Schuman and Ortega, Judges.

LANDAU, P. J.

## LANDAU, P. J.

Plaintiff Quail Hollow West Owners Association (the association) is an association of townhouse owners. It initiated this action against defendants Brownstone Quail Hollow, LLC, Brownstone Quail Hollow, Brownstone Homes, LLC, Brownstone Homes, Randall C. Myers, and Ralph W. Fullerton (collectively referred to as the developers), the developers and builders of the townhouses. Plaintiff alleges that the homes were defectively constructed and asks for an award of damages equal to the repair costs necessitated by the defects and for compensation to the individual owners for their loss of use. The trial court dismissed the complaint on the ground that the association is not the real party in interest.

The association appeals, arguing that it is the real party in interest because it is obligated under the bylaws and the declaration of covenants, conditions, and restrictions of the Quail Hollow West development to maintain and repair portions of the development that are affected by the construction defects. The developers argue that the trial court was correct in dismissing the association's complaint because the individual owners—not the association—are the real parties in interest. We agree with the developers and affirm.

## I. BACKGROUND

Because this is an appeal of a judgment dismissing all claims on the face of the complaint, we accept as true all allegations in the complaint, as well as any reasonable inferences that may be derived from those allegations. *McAlpine v. Multnomah County*, 131 Or App 136, 138, 883 P2d 869 (1994).

Quail Hollow West is a class 1 planned community development consisting of some 93 townhouse units contained within 14 separate buildings. It includes common areas for use by all Quail Hollow West residents. Each individual owner, however, owns separately his or her lot and townhouse, including the front and back yard.

The Quail Hollow West project was developed in five stages, beginning in 1997. After completing the first phase,

the developers filed a Declaration of Covenants, Conditions, and Restrictions of Quail Hollow West ("CCRs"). As each additional phase was completed and new properties were brought into the development, the developers filed an amended declaration.

The CCRs begin with a "[g]eneral declaration" that they

"shall run with and bind the Property, each Lot, and other division, if any, of the Property, the Owners, the Occupants, and all other Persons acquiring any interest in the Property or any portion thereof, and the heirs, successors and assigns of the Owners, the Occupants and such other Person. These [CCRs] shall inure to the benefit of and be burdens upon and enforceable by Declarant and upon and by all Owners, Occupants, future Owners and future Occupants."

The CCRs, among other things, contain restrictions on the uses of and activities on the property within Quail Hollow West, require the owners to maintain their residential units in "good condition and appearance," and specify that each lot owner is a member of the homeowners association. The CCRs authorize the association to levy both annual and special assessments on lots within the development and specify generally that the assessments shall be used "to promote the health, safety and welfare of the Owners, to perform the maintenance and repair provided for herein, and to pay the common expenses of the Association." The CCRs specify that the owners "covenant and agree to pay" these assessments to the association, which is also specifically authorized to "enforce the provisions of the [CCRs and] Bylaws, * * * including prompt action to collect any unpaid assessment."

The association amended the CCRs in July 2002. As amended, the CCRs specify in some detail the repair and maintenance obligations of both the lot owners and the association. The association, for example, is responsible for the maintenance, cleaning, and repairing of gutters and downspouts, as well as "roof replacement, painting and caulking of building exteriors and all other exterior maintenance and repairs in order to prevent water intrusion into the Residential units." The unit owners, on the other hand, are required

to maintain and repair common walls, foundations, crawl spaces, and "the interiors of their respective Residential Units within the building structure."

The developers initially controlled the association. In October 2002, however, the developers turned over control of the association to the individual owners. After that turnover, the association discovered a number of construction defects associated with the grading of yards, irrigation systems, foundations and subterranean walls, fasteners, garage slabs, vertical trim, soffits, windows and doors, roofing material, gutters, roof vents, siding, porch lights, painting, and staining.

The association then filed a complaint against the developers alleging claims for negligence, nuisance, breach of contract, breach of warranty, unlawful trade practices, fraud, and breach of fiduciary duty. The complaint alleges that, as a result of the defects in the construction of the townhouses, the individual homes have experienced "[w]ater intrusion, water damage, and other problems." Specifically, the complaint alleges that

"[t]he water intrusion, use of improper or defective materials, improper installation, and/or noncompliance with local, state and generally approved and accepted building standards has caused extensive property damage to townhomes and to those areas and components that the Association is required to maintain. Said property damage is evidenced by extensive consequential and water damage, dry rot, and mold to and on the beams, headers, sills, ledgers, plywood sheeting, joists, siding, wall studs, decks, outdoor storage closets, garages, dry wall, exterior and interior walls, interior trim, particle board, insulation, carpet, subfloors, and other flooring. Multiple water stains exist throughout Quail Hollow West. Mold, fungi, mildew, and/or rot has been located in some of the interior wall cavities, the interior of townhomes, and other areas within the residential buildings."

The developers responded with a motion to dismiss on the ground that the association was not the real party in interest. ORCP 21 A(6). The developers argued that the individual owners, not the association, are the real parties in interest. The developers argued that the extent to which a

homeowners association may initiate litigation is limited by ORS 94.630(1)(e) and that none of the circumstances listed in the statute as ones in which an association may initiate an action applies to this case. The association responded that this case, in fact, does come within several of the circumstances described in the statute in which a homeowners association is permitted to initiate an action. The association further argued that, in any event, it is the real party in interest under ORCP 26.

The trial court concluded that the association is not the real party in interest under ORCP 26 and is not authorized to initiate this action under ORS 94.630(1)(e). The court explained that

> "[t]here are two problems—who fixes it and who pays for it. The who fixes is your association fixes it. And who pays for it is the individual owners pay for it pursuant to an assessment by the association. Then where the individual owners get the money is the individual owner's problem."

The court entered judgment dismissing the complaint.

## II. ANALYSIS

On appeal, the association advances two "assignments," namely, that the trial court erred in concluding that it is not the real party in interest under ORCP 26 and that it is not authorized to initiate this action under ORS 94.630(1)(e). Thus framed, the association's arguments actually comprise a single assignment of error—that the trial court erred in granting the developers' motion under ORCP 21 A(6). As we have noted many times, an assignment of error pertains to a ruling of the trial court, not to the separate reasons for that ruling. *Archambault v. Ogier*, 194 Or App 361, 366-67, 95 P3d 257 (2004). We turn, then, to the question whether the trial court erred in granting the developers' motion under ORCP 21 A(6).

ORCP 21 A(6) provides that a complaint may be dismissed on the ground that "the party asserting the claim is not the real party in interest." The rule flows from ORCP 26 A, which requires that

> "[e]very action shall be prosecuted in the name of the real party in interest. An executor, administrator, guardian,

conservator, bailee, trustee of an express trust, a party with whom or in whose name a contract has been made for the benefit of another, or a party authorized by statute may sue in that party's own name without joining the party for whose benefit the action is brought."

Case law describes the rule as recognizing two classes of persons who may be regarded as "real parties in interest" under ORCP 26 A. First, there is the class of parties who will be "benefitted or injured by the judgment in the case." *Association of Unit Owners v. Dunning*, 187 Or App 595, 607, 69 P3d 788 (2003). Second, there is the class of persons who are "statutorily authorized to bring an action." *Id.* In this case, the trial court concluded that the association did not come within either class, and the association argues that the court erred in reaching those conclusions.

A.   *"Benefitted or injured by the judgment"*

■       The association argues that it will be benefitted or injured by a judgment in this case because it is authorized—indeed, required—by the bylaws and CCRs to perform maintenance and repairs on portions of the development that were affected by the developers' defective construction and to "enforce" the CCRs, including its own obligation to perform maintenance and repairs. The association's reasoning takes three different tacks.

First, it argues that, because it is authorized to perform maintenance and repairs, its potential recovery of damages in this action will directly affect the extent to which it will have to seek an assessment from the members to cover the remaining costs, if any, of completing the necessary repairs.

Second, the association argues that, because it is authorized to "enforce" the CCRs—which enumerate the association's own obligation to perform repair and maintenance—it is expressly authorized to initiate actions such as this one against the developers.

Third, the association argues that, if nothing else, precedent from this and other jurisdictions compels the conclusion that it is authorized to bring this action against the

developers. We address each of the association's arguments in turn.

1. *The association's obligation to perform maintenance and repair*

The association's first argument is that it will be directly benefitted or injured by a judgment in this case because any judgment will affect the amount of assessments that it will need to impose on the individual townhouse owners. The developers argue—as the trial court concluded—that the association improperly ignores the fact that, whatever the outcome of this case, it is *the townhouse owners* who ultimately will pay for any repairs. The association's only response to that argument is that the judgment in this case will affect how much each of the owners will have to pay. According to the association, if it is permitted to maintain this action, the judgment will affect *all* unit owners. But, if it is not, then some will end up paying for repairs, while others will not.

At the outset, we note that the association's argument is nonresponsive to the developers' basic contention that, whether or not the association brings this action, it is the townhouse owners who will pay for any repairs. If the association brings the action, it is possible that the particular mix of townhouse owners who will pay, as well as the amount of their payments, might be affected. But, either way, it is the owners—and not the association—who will pay.

We need not decide, however, whether the association is correct that its obligation to pay, at least initially, directly affects the association itself, and not just the owners. Even if that were so, it would not be sufficient to establish that the association is the real party in interest.

The unspoken assumption of the association's argument is that, if it brings this action, it somehow forecloses the owners from bringing actions on their own. It is a faulty premise, however.

To begin with, nothing in the bylaws or the CCRs says that the owners are foreclosed from bringing individual actions for such claims as defective construction of their

premises. The individual owners, after all, own their individual units, including the exteriors of the buildings—the portions of the buildings most affected by the defects in construction at issue in this action. The association does not explain, and we do not understand, why the individual owners could not sue the developers for the very same damages that the association seeks in this case—damages based on the amount needed to repair the property and to restore it to the condition that it was represented that it would have upon purchase. *See, e.g., Beik v. American Plaza Co.*, 280 Or 547, 555-56, 572 P2d 305 (1977) ("The rule in Oregon is that the cost of replacement or repair is the correct measure of damage for defects in work unless that remedy generates undue economic waste."). There certainly is no provision stating that the individual owners have assigned to the association any interest that they might have in such litigation.

■       That being the case, the association's argument runs afoul of a central purpose of the real party in interest rule, which is to ensure that a defendant not be subjected to multiple litigation over the same claim. *See, e.g., Metropolitan Property & Casualty v. Harper*, 168 Or App 358, 374, 7 P3d 541 (2000) ("[ORCP 26 A] assures a defending party that it will be required to defend against a claim only once."); *Growers Refrigeration v. Pacific Electrical*, 165 Or App 274, 277, 996 P2d 521 (2000) (a defendant's interest in asserting the real-party-in-interest requirement is to obtain "assurance that it will be required to defend against this claim only once"). In this case, without an assignment to the association of the unit owners' claims against the developers for damages for construction defects for which the association has maintenance and repair responsibility, to permit the association to bring this action exposes the developers to multiple litigation over the same claims.

■       Even assuming for the sake of argument that the bylaws and CCRs somehow implicitly reflect such an assignment of the individual owners' claims, to permit the association to bring this action would not avoid the multiple litigation problem. Any such implicit assignment necessarily would be based on the association's obligation to maintain

and repair the premises. That maintenance and repair obligation, however, is limited to certain portions of the buildings, namely, the roofs and building exteriors. An assignment of the owners' claims as to those portions of the premises, therefore, would not affect the extent to which the individual owners could bring claims for damage to the *interiors* of their units resulting from the same construction defects that are the subject of the association's action against the developers in this case. To allow the association to bring a claim against the developers for damages to certain parts of the townhouse buildings, while leaving the developer exposed to separate claims by individual owners for repairs to other parts of the same buildings caused by the same construction defects again would run afoul of the rule against splitting causes of action, unless the association joined the individual owners as parties to the action. *See generally Wood et ux v. Baker et ux*, 217 Or 279, 284-85, 341 P2d 134 (1959) (discussing purposes of rule against splitting a cause of action); *Stumpf v. Continental Casualty Co.*, 102 Or App 302, 311, 794 P2d 1228 (1990) (the rule explained in *Wood* was not violated when all potential parties were joined as plaintiffs). We reject the association's argument that, because it has an obligation to maintain and repair portions of the premises, it necessarily follows that it is the real party in interest.

### 2. *The obligation to "enforce" the CCRs*

The association's second argument is that, even if the obligation to maintain and repair the premises alone does not make it the real party in interest, the association's obligation to "enforce" that obligation does. Specifically, the association notes that the bylaws authorize the association to "enforce by legal means" the CCRs. According to the association, the term "enforce" can mean "to carry out," and, in that sense, the bylaws can be understood to authorize it to "carry out" its own obligations—including the obligation to maintain and repair the premises—"by legal means," including bringing this action against the developers.

We again find the association's argument unavailing. The argument raises an issue of contract construction. The controlling question is what the parties most likely intended the words of the contract or restrictive covenant to

mean, which we determine by examining the ordinary meaning of the term "in the context of the document as a whole." *Yogman v. Parrott*, 325 Or 358, 361, 937 P2d 1019 (1997).

Ordinarily, the word "enforce" refers to "requiring operation, observance, or protection of laws, orders, contracts and agreements by authority." *Webster's Third New Int'l Dictionary* 751 (unabridged ed 2002). "Enforcement," in turn, refers to "compulsion," to "forcible urging or argument," or to "the compelling of the fulfillment (as of a law or order)." *Id.* It implies that one actor takes some action to ensure that another actor complies with a law, order, or contract to which the latter is subject. *See, e.g., Conifer Ridge Homeowners Assn. v. Hayworth*, 176 Or App 603, 609, 32 P3d 929 (2001) ("enforcement" of CCRs means to "compel" a violator to comply with them).

The association's argument is rather at odds with the ordinary meaning of the terms "enforce" and "enforcement." According to the association, it is "enforcing" the CCRs when it takes legal action against individuals who are not even subject to them. That makes no sense.

■  What is more, the association's argument is at odds with the way in which the CCRs themselves employ the term. The CCRs state that "[e]ach Owner shall comply with the Declaration, Bylaws, and any rules and regulations adopted pursuant thereto." In the next section the CCRs then provide that "[t]he Board [of the association] shall take prompt action *against any violator* to enforce the provision of the Declaration, Bylaws, and any rules and regulations adopted pursuant thereto." (Emphasis added.) Thus, consistently with the ordinary meaning of the term "enforce," the CCRs contemplate that the association's enforcement authority pertains to taking action against those townhouse owners who violate the terms of the CCRs or bylaws. By no reasonable construction of the term do the CCRs suggest that the association is authorized to "enforce" the terms of the CCRs against anyone else.

In that context, it becomes clear that the provision in the bylaws that states more broadly that the association has the authority to "[e]nforce by legal means" the provisions of the CCRs refers to the enforcement of the provisions of the

CCRs against persons who are subject to its terms. Nowhere do the bylaws suggest that the term "enforce" carries a different meaning in the bylaws than it does in the CCRs. We reject the association's argument that its authority to "enforce" the CCRs includes authority to sue the developers in this case.

### 3. *Case law*

■     The association argues that three cases—one from Oregon and two from other jurisdictions—support its argument that it is the real party in interest in this case. At the outset, we pause to observe that cases from other jurisdictions are of limited assistance to us, both because the proper disposition of the issue depends on the specific nature of each state's statutes and rules and because there is a wide variety of decisions around the country on the question whether condominium or townhouse associations are the real parties in interest in construction defect cases. *See, e.g., Jablonsky v. Klemm*, 377 NW2d 560 (ND 1985) (comparing cases and concluding that, without actual title to common areas of affected property, the obligation to repair does not make a condominium association the real party in interest). In any event, we are not persuaded that any of the three decisions on which the association relies is controlling in this case.

The first case on which the association relies is *Towerhill Condo. Assoc. v. American Condo. Homes*, 66 Or App 342, 675 P2d 1051 (1984). In that case, we held that a condominium association, in its representative capacity, was the real party in interest in an action against a developer for damages based on alleged defects in the common elements. 66 Or App at 348. That conclusion, however, was dictated by what we characterized as the "broad powers" conferred by a 1979 statute on condominium associations. *Id.* at 347. The statute, which is now codified at ORS 100.405, authorized a condominium association to bring an action "in its own name on behalf of itself or on behalf of two or more unit owners on matters affecting the condominium." No one questioned whether the statute authorized the condominium association to bring the action; the issue was whether the statute, which

had been enacted after the developer had completed construction, violated federal and state constitutional prohibitions on the passage of laws impairing the obligations of contracts. 66 Or App at 346. Our opinion concluding that there was no such impairment says nothing that supports the association's arguments in this case.

The second case on which the association relies is *Brickyard Homeowners' Ass'n v. Gibbons Realty*, 668 P2d 535 (Utah 1983), in which the Utah Supreme Court concluded that a management committee (*i.e.*, a homeowners association) was the real party in interest in litigation against the developer of the condominium development for damages caused by defects in the common areas as well as individual units. The court's decision, however, was based on a broadly worded statute nearly identical to the one before this court in *Towerhill*.

The third case on which the association relies is a Connecticut trial court decision reported in *Doyle v. A & P Realty Corp. et al*, 36 Conn Supp 126, 414 A2d 204 (1980). In that case, both a condominium association and its individual member-owners brought an action against developers and contractors for construction defects. The defendants moved to strike the association from the complaint on the ground that the association "lack[ed] standing." The trial court denied the motion. *Id.* at 128. There is no discussion of the state's real party in interest rule. There is no discussion of any state rule against splitting causes of action. And there is no discussion of the extent to which the fact that the owners also were named as parties affected the court's decision. *Cf. Stumpf*, 102 Or App at 311 (no violation of the rule against splitting causes of action when all parties are joined).

We conclude that, unless a statute authorizes the association to bring this action, it is not the real party in interest. We therefore turn to the statutory issue.

B. *Statutory authorization*

As we have noted, under ORCP 26, a person or entity that might not otherwise qualify may nevertheless be the real party in interest because of explicit statutory authorization to bring the action. In this case, the association argues

that ORS 94.630(1)(e) provides just such statutory authorization. That statute provides, in part:

"(1)    Subject to subsection (2) of this section and except as otherwise provided in its declaration or bylaws, a homeowners association may:

"* * * * *

"(e)    Subject to subsection (4) of this section, initiate or intervene in litigation or administrative proceedings in its own name and without joining the individual owners in the following:

"(A)    Matters relating to the collection of assessments and the enforcement of governing documents;

"(B)    Matters arising out of contracts to which the association is a party;

"(C)    Actions seeking equitable or other nonmonetary relief regarding matters that affect the common interests of the owners, including but not limited to the abatement of nuisance;

"(D)    Matters relating to or affecting common property, including but not limited to actions for damage, destruction, impairment or loss of use of any common property;

"(E)    Matters relating to or affecting the lots or interests of the owners including but not limited to damage, destruction, impairment or loss of use of a lot or portion thereof, if:

"(i)    Resulting from a nuisance or a defect in or damage to common property; or

"(ii)    Required to facilitate repair to any common property; and

"(F)    Any other matter to which the association has standing under law or pursuant to the declaration or bylaws[.]"

The association argues that it is authorized to bring this action under subparagraphs (A), (D), (E), and (F). We will address each subparagraph in turn. In doing so, we apply the familiar interpretive principles set out in *PGE v. Bureau of Labor and Industries*, 317 Or 606, 610-12, 859 P2d 1143 (1993). That is, we attempt to determine the meaning of the

statutes that was intended by the legislature that enacted them, examining the text in context and, if necessary, legislative history and other aids to construction. *Id.*

We observe at the outset that the statute authorizes, in certain circumstances, a homeowners association to sue "in its own name and without joining the individual owners." ORS 94.630(1)(e). The statute does not, by its terms, authorize associations to sue *on behalf of* the individual owners. *Cf. Association of Unit Owners v. Dunning,* 187 Or App 595, 608, 69 P3d 788 (2003) (applying version of condominium statute that permitted condominium associations to sue "on behalf of itself or on behalf of two or more unit owners on matters affecting the condominium"). In this case, the association purports to sue both in its own name and on behalf of the individual owners. Because the statute does not authorize the association to sue on behalf of the individual members, however, it may not do so in this case. We therefore turn to the question whether any of the four subparagraphs of the statute on which the association relies authorizes it to bring this action on its own behalf.

1. *Subparagraph (A)*

Subparagraph (A) authorizes a homeowners association to bring an action concerning "[m]atters relating to the collection of assessments and the enforcement of governing documents." The association acknowledges that its action in this case does not relate to the collection of assessments. Its sole argument with respect to subparagraph (A) is that the case relates to the "enforcement" of governing documents, namely, the bylaws and CCRs. The argument, in other words, reprises the association's contention that, when it takes any action in pursuit of its own obligations under the CCRs, it is "enforcing" the CCRs, even as against persons who are not subject to them.

As we have noted, the association's argument in that regard is at odds with the ordinary meaning of the term "enforce" and is likewise at odds with the manner in which the term is used in the CCRs and bylaws themselves. The question at this juncture is whether there is any indication in ORS 94.630(1)(e)(A) that the legislature intended the term to be used in a manner different from the ordinary meaning

that is reflected in the CCRs and bylaws. *See PGE*, 317 Or at 611 ("[W]ords of common usage typically should be given their plain, natural, and ordinary meaning."); *Haynes v. Tri-County Metro.*, 337 Or 659, 663, 103 P3d 101 (2004) (same). The association does not suggest that any such indication may be found in the wording of the statute. It merely reiterates its earlier arguments about the meaning of the terms "enforce" and "enforcement." We likewise are unaware of any indication in the text of the statute in context that the legislature intended the reference to the "enforcement" of governing documents to mean something other than what it ordinarily means, namely, compelling persons who are subject to those governing documents to comply with them. The action in this case does not in any way relate to such an enforcement of the CCRs. We therefore conclude that subparagraph (A) does not authorize the association to bring this action.

## 2. *Subparagraph (D)*

Subparagraph (D) authorizes a homeowners association to bring an action as to matters "relating to or affecting common property." ORS 94.550(7) defines "common property" as "any real property or interest in real property within a planned community which is owned, held or leased by the homeowners association." The association argues that its maintenance and repair responsibilities are an "interest in real property," and that, accordingly, this action is one that relates to or concerns "common property" within the meaning of subparagraph (D).

The question is thus whether a contractual obligation to maintain or repair real property is itself an "interest in real property." The statute does not define that particular phrase. Under the circumstances, we assume that the legislature intended the phrase to have the ordinary meaning that would be ascribed to its terms. *PGE*, 317 Or at 611.

In ordinary parlance, an "interest" in property denotes a "right, title, or legal share" in the property. *Webster's* at 1178. Consistently with that ordinary meaning, in legal terms, an "interest" in property generally refers to "a right, claim, title or legal share in something. * * * More particularly it means a right to have the advantage accruing

from anything; any right in the nature of property, but less than title." *Black's Law Dictionary* 729 (5th ed 1979). The *Restatement of Property* section 5, comment c (1936), likewise refers to an "interest in land or other thing" as "rights, privileges, powers, and immunities with regard to specific land." All of the foregoing suggest that an "interest" in real property refers to an affirmative right—the right to the use and enjoyment of the property, as opposed to an obligation to take care of it with no corresponding benefit.

That ordinary meaning is suggested by the legislature's use of the term "interest" elsewhere in the same section of the statute. In ORS 94.630(1)(i), for example, the statute authorizes a homeowners association to "[a]cquire, hold, encumber and convey in its own name any right, title, or interest to real or personal property." The statute suggests that an "interest" in real property is something that the association is capable of holding and conveying, such as the right to use, develop, and enjoy land in a particular manner.

Other provisions of ORS chapter 94 likewise employ the term in its ordinary sense. ORS 94.531, for example, pertains to the severing of a developer's "interest in real property" into transferrable "development credits," which, in turn, pertain to the right to develop the real property. ORS 94.623 similarly refers to the transfer of interests in particular lots and characterizes such interests in terms of "rights" to expand, annex, and the like.

The association's proposed definition of the term "interest in real property" to include any obligations with respect to real property does not fit comfortably within the ordinary meaning of the terms. A landscape contractor, for example, who contracts to maintain a yard does not, in ordinary sense, have an "interest" in the real property that arises from the obligation.

Nor does the association's proposed definition comport with the usage of the relevant term elsewhere in the relevant statutes. ORS 94.630(1)(g), for example, enumerates as among the homeowners association's powers and obligations the authority to "[r]egulate the use, maintenance, repair, replacement and modification of common property." If the association's obligation of maintenance and repair is already

an interest in common property, then that section becomes nonsense—it would mean that the association has the authority to regulate the maintenance and repair of its obligation of maintenance and repair.

The association insists that its action against the developers pertains to matters "affecting common property," at least in the sense that it pertains to the negligent construction of property that, albeit held by the individual owners, nevertheless affects the association's obligations of maintenance and repair. According to the association, subparagraph (D) "gives the association standing to sue, in tort or contract, as the real party in interest for defects in and damages to those areas for which the association has the rights and responsibilities to maintain."

■    The problem is that the argument cannot be reconciled with the actual wording of the statute. Subparagraph (D) authorizes a suit pertaining to matters "affecting common property," which is defined as an interest in property that *the association itself* holds, not property that the individual owners hold.

We conclude that subparagraph (D) does not authorize the association's action.

3.   *Subparagraph (E)*

Subparagraph (E) of ORS 94.630(1)(e) provides that the association may bring an action on matters "relating to or affecting the lots or interests of the owners including but not limited to damage, destruction, impairment or loss of use of a lot or portion thereof," but only if that damage, destruction, impairment, or loss of use is "(i) [r]esulting from a nuisance or defect in or damage to *common property*; or (ii) [r]equired to facilitate repair to any *common property*." (Emphasis added.) The association argues that its action in this case is authorized by subparagraph (E) in that the damage and loss of use of the owners' premises resulted in damage to the association's obligation to maintain and repair. The association explicitly equates its own obligation to maintain and repair with the reference to "common property."

Thus, the association's argument under subparagraph (E) raises precisely the same issue that its argument

under subparagraph (D) raised. In both cases, the dispositive question is whether the association's obligation of maintenance and repair is itself "common property" within the meaning of the statute. We have held that it is not. Subparagraph (E) therefore does not authorize the association's action in this case.

4.  *Subparagraph (F)*

Subparagraph (F) authorizes a homeowners association to initiate litigation regarding "[a]ny other matter to which the association has standing under law or pursuant to the declaration or bylaws." The association argues that the subparagraph authorizes it to bring this action because it has brought the action "pursuant to the declaration or bylaws." Thus, the association's argument is predicated on the assumption that the CCRs and bylaws authorize it to bring the action. As we have noted, however, the assumption is ill-founded. We therefore conclude that subparagraph (F) does not authorize the association to bring this action.

In sum, we conclude that the association is not the real party in interest. The trial court did not err in dismissing the complaint under ORCP 21 A(6).

Affirmed.